UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| WILLIE J. WRIGHT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 1:11-CV-00389 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Willie Wright appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Wright applied for DIB and SSI in June 2008 alleging disability as of March 15, 2007. (Tr. 129-38.) The Commissioner denied his application initially and upon reconsideration, and Wright requested an administrative hearing. (Tr. 62-77.) On May 25, 2010, a hearing was conducted by Administrative Law Judge ("ALJ") Yvonne Stam, at which Wright (who was represented by counsel), his friend, and a vocational expert testified. (Tr. 33-57.) On July 28, 2010, the ALJ rendered an unfavorable decision to Wright, concluding that he was not disabled

---

[1] All parties have consented to the Magistrate Judge. (Docket # 14); *see* 28 U.S.C. § 636(c).

because he could perform his past relevant work as a caterer helper and bench assembler, as well as a significant number of other jobs in the economy. (Tr. 9-20.) The Appeals Council denied his request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-5, 30-32, 235-36, 623-78.)

Wright filed a complaint with this Court on November 14, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.) He advances just one argument in this appeal: that the ALJ erred at step three when determining that he did not meet or equal Listing 14.02, the applicable listing for systemic lupus erythematosus ("SLE"). (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 15-16.)

## II. FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, Wright was thirty-four years old; had obtained his high school equivalency degree (GED) and completed two years of college; and possessed work experience as a caterer, laborer, assembler, and machinist. (Tr. 129, 171, 445.) He alleges disability as a result of the following impairments: cephalalgia (headaches); seizure disorder; myocardial infarction complicated by ventricular fibrillation; single vessel obstructive coronary artery disease; history of thrombus post balloon angioplasty and intracoronary thrombectomy; dyspnea, syncope or near syncope; weight loss with subsequent loss of strength; hypertension; status post bilateral knee ACL reconstruction; lung mass with hilarlymphadenopathy (resolved); dyslipidemia; hyperlipidemia; phospholipid antibody syndrome ("APS"); SLE; history of collapsed lung post right wrist surgery; post fracture of the right ankle; history of cold exposure

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 678-page administrative record necessary to the decision.

which causes numbness of the fingers; cognitive disorder, not otherwise specified; and dysthymic disorder. (Opening Br. 2.)

### B. *Wright's Testimony at the Hearing*

At the hearing, Wright testified that he lives with his mother (Tr. 36.) In a typical day, he alternates between sitting and taking short walks in the house during daylight hours to reduce his pain and stiffness; after sunset he takes longer walks outdoors. (Tr. 43, 47-49.) He is independent with his self care, but his mother performs all of the household tasks. (Tr. 44.) He no longer drives a car. (Tr. 44.) If he has a seizure, which occurs about every six weeks, he spends most of that day in bed due to increased muscle pain and a lack of energy; it then takes him three to four days until he feels like he did before the seizure. (Tr. 45-46.)

When asked why he thought he could not work, Wright explained that he suffers from pain in his joints; breathing problems; and hand tremors. (Tr. 40.) He also stated that he experiences low back pain and limb numbness if he sits longer than fifteen minutes. (Tr. 41-42.) He estimated that he could stand for fifteen to twenty minutes before feeling lightheaded and dizzy; walk one-half of a mile; and lift ten to twenty pounds. (Tr. 43.) In addition, he complained of balance problems and difficulty with fine motor coordination.[3] (Tr. 42, 45, 48-49.)

### C. *Summary of the Medical Evidence*

Wright visited the emergency room five times in 2007. In March, he sought care for acute vomiting, diarrhea, and dehydration (Tr. 268-69), and in June, for abdominal pain, which was diagnosed as acute alcohol/diet-induced gastritis status post resolution and abdominal pain

---

[3] Also, Wright confided that he had used marijuana three to four weeks earlier, but stated that he had not consumed alcohol since March 2008. (Tr. 37-38.) Yet, upon further questioning about evidence from December 2008 evidencing a blood alcohol level in excess of the legal limit, Wright admitted that he also drank at that time. (Tr. 38-39.)

status post resolution (Tr. 263-64). In August, he returned for abdominal pain and a headache and was diagnosed with viral gastritis and cephalalgia. (Tr. 302-03.) He visited two times in November; first for testicular pain, which was diagnosed as prostatitis (Tr. 238, 252), and then for a seizure, which was diagnosed as acute convulsive disorder and acute generalized seizure (Tr. 292-94). He was referred to a neurologist at his second November visit. (Tr. 294.)

Wright visited the emergency room twice in January 2008, first for abdominal pain and then for a seizure. (Tr. 282, 320.) At the first visit he stated that he often experiences abdominal pain after drinking alcohol (Tr. 282); at the second visit, he admitted to missing recent doses of his seizure medication (Tr. 320). His diagnoses included acute seizure episode with history of seizure disorder, medication non-compliance by history, and right foot pain. (Tr. 322.) He returned to the emergency room the following month after a seizure; he again was out of Dilantin. (Tr. 312.) He was diagnosed with recurrent seizure and medical noncompliance. (Tr. 313.)

In March 2008, Wright was hospitalized for six days with diagnoses of acute anterior myocardial infarction complicated by ventricular fibrillation, single vessel obstructive coronary artery disease, chronic tobacco abuse, history of seizure disorder, history of medical noncompliance, and urine positivity on admission for both opiates and cannabis but negative for cocaine. (Tr. 367-69.) After a cardiac catheterization, Dr. Kelly performed a balloon angioplasty and intracoronary thrombectomy. (Tr. 367-69.) The post-infarction course was relatively uncomplicated; an echocardiogram demonstrated mild to moderate left ventricular dysfunction with an ejection fraction of 40 to 50% with severe hypokinesis involving the apex, distal inferior wall, and septum. (Tr. 367-69.) Wright was to get medicines through a patient assistance

4

program, and he was strongly encouraged to quit smoking, not use illicit drugs, and comply with medical therapy. (Tr. 367-69.)

A cardiologist saw Wright for follow-up care in March and May. (Tr. 342-44, 347-48.) Wright denied chest pain, dyspnea, syncope, or near syncope, and said that he was pleased with his status. (Tr. 347.) Near that same time, Wright sought medication samples at Fort Wayne Neurology, stating that he had no money or insurance to get more Dilantin. (Tr. 430.)

In July 2008, Wayne Von Bargen, Ph.D., completed a mental status exam on Wright at the request of the Social Security Administration. (Tr. 444-46.) He denied using marijuana currently, but admitted that he had in the past; although he reported memory problems, the mental status exam suggested intact cognitive functioning and no significant mental health difficulties. (Tr. 445.) Dr. Von Bargen diagnosed Wright with cannabis abuse in early full remission and assigned him a Global Assessment of Functioning ("GAF") score of 70.[4] (Tr. 446.)

That same month, Donna Unversaw, Ph.D., a state agency psychologist, reviewed Wright's record and found that he had mild difficulties in concentration, persistence, or pace, but no restrictions in activities of daily living or difficulties in maintaining social functioning. (Tr. 448-60.) Accordingly, she opined that he did not have a severe mental impairment. (Tr. 448.)

In August 2008, Dr. H. Bacchus performed a consultative physical exam of Wright at the request of the Social Security Administration. (Tr. 462-64.) He was six feet tall and weighed

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

5

123 pounds; his muscle strength and tone were 4/5 in all extremities; and his grip strength was 4/5 on the right and 5/5 on the left. (Tr. 463.) Fine finger manipulations were preserved, but weak on the right; sensory exam was intact in light touch, pain, and temperature. (Tr. 463.) He had a flat affect and was slightly anxious. (Tr. 462.) Diagnoses included history of single-vessel coronary artery disease with myocardial infarction; status-post angioplasty with stent; history of supraventricular tachycardia; chest pain; seizure disorder; weight loss with subsequent loss of strength; history of recurrent spontaneous pneumothorax; stable hypertension with medication; tobacco dependence; history of alcohol, opiate, and cannabinoid use; status-post bilateral knee ACL reconstruction; and anxiety. (Tr. 463-64.)

That same month, Wright saw Dr. Patrick Daley, a cardiologist, for follow-up care. (Tr. 467-68.) He reported that a lack of energy, nausea, and intermittent lightheadedness kept him from working. (Tr. 467.) A cardiac exam, however, was normal; Dr. Daley concluded that Wright's symptoms were noncardiac and likely were the result of medication side effects. (Tr. 468.)

In October 2008, Dr. F. Montoya, a state agency physician, reviewed Wright's record and concluded that he had the ability to lift or carry ten pounds frequently and twenty pounds occasionally; sit for six hours in an eight-hour workday; stand or walk up to six hours in an eight-hour workday; frequently balance, stoop, kneel, crouch, and crawl; occasionally climb ramps or stairs, but never ladders, ropes, or scaffolds; and avoid all exposure to hazards such as machinery and heights. (Tr. 474-81.)

In November, Wright visited the emergency room after a seizure, reporting that he had been out of Dilantin for the last few weeks due to limited finances; he admitted that he had not

6

taken his other medications either, even though he had them at home. (Tr. 514-16.) Wright was diagnosed with acute seizure with history of seizure disorder; medication noncompliance; acute cephalalgia, improved. (Tr. 514-16.) He returned to the emergency room the following month due to chest pain after drinking alcohol. (Tr. 521.) The emergency room doctor found that given Wright's intoxication, abnormal EKG, and prior history, he could not exclude a myocardial infarction, but nevertheless thought that it was not likely. (Tr. 522.) He concluded that Wright may have acute coronary syndrome and referred him to Fort Wayne Cardiology. (Tr. 522.) Wright later left the hospital against medical advice. (Tr. 520.)

In January 2009, Wright was seen at the Matthew 25 clinic concerning his seizures and medications. (Tr. 610.) In April, he was seen by the cardiology and general medicine clinics. (Tr. 603, 607.) In March, Dr. Venkata Kancherla, performed a consultative physical examination; Wright reported that he had not had a seizure in four months, but did have leg pain and foot tingling. (Tr. 482-85.) Dr. Kancherla found that Wright had a normal gait and normal strength in his extremities. (Tr. 482-85.)

In May 2009, Dr. Von Bargen completed a second mental status examination of Wright; this time he administered the Wechsler Memory Scale–III. (Tr. 487-89.) On the Scale, he earned indexes ranging from 67 to 77, which fell in the impaired to borderline range. (Tr. 488.) Specifically, scores addressing his ability to sustain attention and concentration were in the impaired range, and Dr. Von Bargen thought that Wright's history suggested a possible organic component to these problems; he also thought that Wright's mild anxiety and depression may contribute to his memory difficulties. (Tr. 489.) Overall, Dr. Von Bargen found that Wright could care for himself and perform routine daily activities and that his presentation was similar

7

to his prior evaluation, except that he was slightly more irritable and frustrated. (Tr. 489.) Dr. Von Bargen assigned a GAF of 55 and a diagnosis of cognitive disorder, not otherwise specified, and dysthymic disorder, secondary type. (Tr. 489.)

That same month, Maura Clark, Ph.D., a state agency psychologist, reviewed Wright's record and opined that he had a mild restriction in daily living activities; mild difficulties in social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 496-512.) In a mental residual functional capacity assessment, Dr. Clark further indicated that Wright was moderately limited in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically-based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 510-11.) Dr. Clark wrote that Wright appeared capable of performing simple tasks and tolerating superficial, casual interactions with others; accordingly, she concluded that although he could not do complex tasks, Wright was able to complete repetitive tasks on a sustained basis without special consideration to the extent his physical condition permitted. (Tr. 510-11.)

Wright visited the emergency room later in May 2009 due to a seizure; his last seizure was four or five months earlier. (Tr. 529.) He stated that he had been taking his medications, although his Dilantin level was slightly low upon testing. (Tr. 530.) He returned the following month after another seizure. (Tr. 532.) His friend accompanied him and said that Wright had been taking his medications as prescribed. (Tr. 532.) His medications were adjusted, and he was sent to Matthew 25. (Tr. 600-01.) In August, Wright again visited the emergency room, this time due to intermittent left leg pain. (Tr. 540.) The doctor found that this was a chronic problem that

did not require further work up in the emergency room. (Tr. 541.)

Wright was hospitalized for two days in August due to chest pain. (Tr. 550.) A CT scan showed a lung mass with hilar lymphadenopathy. (Tr. 550.) A discharge diagnosis included lung mass, left upper lobe; weight loss; coronary artery disease; dyslipidemia; history of marijuana abuse; and chest wall pain probably secondary to the lung mass. (Tr. 550.) In October 2009, Wright reported that he had not had a seizure since May. (Tr. 596-97.)

In March 2010, Wright again appeared at the emergency room after having a seizure. (Tr. 566.) He had been taking his medications. (Tr. 567.) Later that month, Wright was hospitalized for five days due to acute recurrent left upper lobe infiltrate. (Tr. 569.) A pulmonary specialist was unsure about the etiology of his lung abnormality and recommended a continued work up at Matthew 25. (Tr. 569.) A rheumatology consultation was also suggested. (Tr. 569.)

In April, Dr. Jeffrey Walker at the Matthew 25 clinic penned a letter stating that Wright had several serious chronic conditions, including premature coronary artery disease, epilepsy, hypertension, hyperlipidemia, and most likely SLE, for which he was currently undergoing diagnostic testing. (Tr. 595.) He indicated that Wright's coronary artery disease, seizures, and probable SLE limit his ability to perform manual labor and, more particularly, that Wright is "in need of disability income as he is unable to work in roofing now." (Tr. 595.)

Later that month, Dr. Kenneth Smith, a rheumatologist, evaluated Wright at the request of Matthew 25. (Tr. 619.) He noted that testing for APS was positive on two occasions and that several laboratory tests for SLE were positive as well.[5] (Tr. 619.) A cardiac examination

---

[5] APS is an autoimmune disease causing anticoagulation that is often associated with SLE. THE MERCK MANUAL 1082 (Mark H. Beers, ed., 18th ed. 2006).

9

indicated a faint grade I systolic ejection murmur; a shoulder examination revealed full elevation and abduction but only twenty percent of rotation bilaterally with severe pain in extremes of rotation; and a lower examination showed full painless movement. (Tr. 621.) Otherwise, the exam findings were unremarkable. (Tr. 621.) Dr. Smith concluded that Wright likely suffers from SLE in addition to APS, which "may have accounted for most of his difficulties" and "very severe troubles." (Tr. 621.) Dr. Smith also thought one of the positive laboratory tests might indicate the possibility of an autoimmune liver disease such as biliary cirrhosis. (Tr. 621.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp

of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. *The ALJ's Decision*

On July 28, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 9-20.) She found at step one of the five-step analysis that Wright had not engaged in substantial gainful activity after his alleged onset date and, at step two, that his blood clotting disorder, seizures, and coronary artery disease were severe disorders. (Tr. 11.) At step three, the ALJ determined that Wright's impairment or combination of impairments were not severe enough to meet or equal a listing. (Tr. 13.)

Before proceeding to step four, the ALJ determined that Wright's symptom testimony was not reliable to the extent it portrayed limitations in excess of the following RFC:

> [T]he claimant has the residual functional capacity to perform light work . . . with the following limitations: lift 20 pounds occasionally and 10 pounds frequently; stand and walk six hours in an eight hour workday; and sit six hours in an eight hour workday for a total of eight hours; only occasionally climb ramps and stairs; never climb ladders, ropes and scaffolds; frequently balance, stoop, kneel, crouch and crawl; and should avoid all exposure to hazards such as moving machinery and unprotected heights.

(Tr. 13.) Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four that Wright was able to perform his past relevant work as a caterer helper and bench assembler. (Tr. 18.) In addition, the ALJ concluded at step five that he could perform a significant number of other light jobs (ticket taker, inspect, and furniture rental clerk) and sedentary jobs (charge account clerk and election clerk) in the economy. (Tr. 19.) Accordingly, Wright's claims for DIB and SSI were denied. (Tr. 20.)

## C. The ALJ's Step-Three Finding Will Be Affirmed

Wright's sole argument on appeal is that the ALJ failed to adequately evaluate at step three whether he met or equaled Listing 14.02, the listing for SLE. For the following reasons, Wright's argument is unavailing, and the Commissioner's final decision will be affirmed.

The listings describe impairments that are considered presumptively disabling when specific criteria are met. 20 C.F.R. §§ 404.1520(d), 404.1525(a), 416.920(d), 416.925(a); 20 C.F.R. § 404, Subpt. P, App. 1; *see Kastner v. Astrue*, __ F.3d __, 2012 WL 4799021, at *4 (7th Cir. Oct. 10, 2012). To meet or equal a listed impairment, a claimant must satisfy all of the criteria of the listed impairment.[7] *Kastner*, 2012 WL 4799021, at *4; *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Maggard v. Apfel*, 167 F.3d 376, 379-80 (7th Cir. 1999). The claimant bears the burden of proving that his condition meets or equals a listed impairment. *Ribaudo*, 458 F.3d at 483; *Maggard*, 167 F.3d at 379-80.

In order to meet Listing 14.02, a claimant must produce objective medical evidence of a diagnosis of SLE,[8] with:

---

[7] "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Booth v. Comm'r of Soc. Sec.*, No. 1:06-cv-122, 2008 WL 744230, at *11 (S.D. Ohio Mar. 19, 2008) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)). "Medical equivalence requires that there be a medical finding equivalent to each and every criterion for a particular impairment." *Jackson v. Sullivan*, No. 91 C 7975, 1992 WL 142614, at *5 (N.D. Ill. June 10, 1992) (citing *Zebley*, 493 U.S. at 531); *see Bellmore v. Astrue*, No. 4:08-cv-94, 2010 WL 1266494, at *14 (N.D. Ind. Mar. 25, 2010) ("A claimant must meet the criteria in the capsule definition, as well as the criteria in the subsidiary paragraphs." (citations omitted)). Here, Wright's arguments center solely on whether he met, rather than equaled, Listing 14.02's requirements, and thus the issue of medical equivalency needs no further mention. *See United States v. Tockes*, 530 F.3d 628, 633 (7th Cir. 2008) ("Unsupported and undeveloped arguments . . . are considered waived.").

[8] The parties do not dispute that Wright meets this threshold finding of a diagnosis of SLE, which is defined in the listings as:

> a chronic inflammatory disease that can affect any organ or body system. It is frequently, but not always, accompanied by constitutional symptoms or signs (severe fatigue, fever, malaise, involuntary weight loss). Major organ or body system involvement can include: Respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal

13

  A. Involvement of two or more organs/body systems, with:

     1. One of the organs/body systems involved to at least a moderate level of severity; and

     2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

or

  B. Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

     1. Limitation of activities of daily living.

     2. Limitation in maintaining social functioning.

     3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. § 404, Subpart P, App. 1, 14.02.

Here, the ALJ expressly contemplated Listing 14.02, but found that Wright did not meet its requirements, explaining that his SLE "d[id] not involve two or more body systems." (Tr. 13.) Wright challenges the ALJ's findings in this respect, contending that his seizure disorder evidences neurological system involvement; his past myocardial infarction, heart problems, and hypertension evidence cardiovascular system involvement; his history of arthralgias and myalgias evidences musculoskeletal system involvement; and his cognitive disorder evidences

---

(glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ("lupus fog"), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis). Immunologically, there is an array of circulating serum auto-antibodies and pro- and anti-coagulant proteins that may occur in a highly variable pattern.

20 C.F.R. § 404, Subpart P, App. 1, 14.00D1.

mental involvement.[9] (Opening Br. 15-16.)

As Wright sees it, he is entitled to a remand on the grounds that "[n]either the Commissioner nor the ALJ provide any medical opinion that these organs/body systems are *not* involved." (Reply Br. 2 (emphasis added).) But Wright's attempt to shift the burden to the Commissioner rings the death knell for his appeal. To reiterate, at step three, *he* bears the burden of producing evidence sufficient to show that he meets all of the Listing's requirements. *See Maggard*, 167 F.3d at 380; *Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004); *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002); *Clifford*, 227 F.3d at 868. Wright has failed to point to *any* evidence that shows his various impairments were caused by SLE. In fact, the most helpful evidence to Wright in this respect—which, oddly enough, he does not even cite in his argument—is Dr. Smith's statement that Wright's APS "*may* have accounted for most of his difficulties" and "very severe troubles." (Tr. 621 (emphasis added).) This statement, however, is far from definitive as to the etiology of Wright's various conditions and thus falls short of satisfying Listing 14.02A's objective requirements. *See, e.g.*, Brown v. Astrue, No. H-08-2299, 2010 WL 1257804, at *9 (S.D. Tex. Mar. 25, 2010) (finding that claimant's alleged system involvement, absent supporting laboratory or clinical data, was insufficient to meet the criteria of Listing 14.02).

And, as the Commissioner argues, even if at least two of Wright's organs or body systems were involved in his SLE, he still fails to show that any of these related conditions rose "to at least a moderate level of severity" as required by Listing 14.02. Significantly, the ALJ's severity ratings at step two are not determinative of his step three findings because the

---

[9] Wright does not argue that his SLE satisfies subpart B of Listing 14.02.

regulations specifically provide that the term "severity" as used in Listing 14.02 does not have the same meaning as when used in the step-two analysis. 20 C.F.R. § 404, Subpart P, App. 1, 14.00C. Accordingly, that the ALJ found several of Wright's conditions to be "severe impairments" at step two is not pivotal. Rather, when used in the Listing, the term "severity" means "medical severity as used by the medical community." 20 C.F.R. § 404, Subpart P, App. 1, 14.00C.

As the ALJ observed, Wright's seizure disorder was controlled by medications, all imaging of his brain was normal, and aggravations of the disorder most often were related to his medication noncompliance. (Tr. 11, 14-15; *see, e,g*., Tr. 312-13, 320, 384, 514-15, 529-33, 566-67.) Furthermore, as the ALJ noted, although Wright attributed his noncompliance to money problems, he was also noncompliant with the medications he already had at home and apparently was able to afford marijuana, alcohol, and cigarettes. (Tr. 11, 15; *see* Tr. 514.) On these bases, the ALJ reasonably concluded that Wright's seizure disorder did not rise to the level of severity required to meet Listing 14.02.

Likewise, the ALJ found that Wright's cardiac condition had not required significant treatment since his heart attack in 2008 and that Dr. Walker, his family practitioner, restricted him only from performing manual labor such as roofing work. (Tr. 12, 16.) He further noted that although Wright complained of symptoms in August 2008, his cardiologist found they were noncardiac in nature and likely side effects of his medications; the ALJ also considered that Wright's most recent ejection fraction was normal. (Tr. 12, 15-16.) Based on this evidence, the ALJ reasonably concluded that Wright's cardiac condition lacked the severity to meet Listing 14.02.

16

Similarly, as to Wright's musculoskeletal problems, the ALJ observed that although Wright testified to joint pain, the medical records generally revealed normal findings. (Tr. 14.) Specifically, the ALJ noted that although Wright reported difficulty with his hands, Dr. Smith, Wright's rheumotologist, did not find any abnormalities with his hands. (Tr. 14.) The ALJ also considered that the physical examination findings from Dr. Bacchus and Dr. Kancherla were both relatively benign, finding that Wright had a normal gait, normal muscle strength in his extremities, mildly decreased right hand grip strength, and a sensory impairment over his right foot. (Tr. 15-16.)

And in terms of Wright's cognitive limitations, the ALJ found that, for the most part, the psychologists of record indicated that he had no more than minimal mental health symptoms. (Tr. 12-13.) Also, Wright never complained about depression or memory problems to his treating physicians, and he never received any mental health treatment. (Tr. 12-13.) In sum, the ALJ's thorough analysis of Wright's neurological, cardiovascular, musculoskeletal, and cognitive systems reveals that none of these impairments were of sufficient severity to satisfy the requirements of Listing 14.02. *See, e.g.*, *Kibler v. Astrue*, No. 5:10-cv-59, 2011 WL 2490590, at *3 (W.D. Va. June 22, 2011) (finding that claimant's alleged systems involvement was not of sufficient severity to meet the requirements of Listing 14.02); *DKB v. U.S. Comm'r Soc. Sec. Admin.*, No. 09-cv-257, 2010 WL 502999, at *2-3 (W.D. La. Feb. 8, 2010) (same); *see generally Brown*, 2010 WL 1257804, at *8 (emphasizing that the listings criteria are "demanding and stringent" and the "mere diagnosis of [lupus] will not suffice").

Moreover, the Commissioner argues that regardless of whether Wright met the requirements of subsection A1 of Listing 14.02, he still failed to present evidence that he met the

criteria of subsection A2—that he has at least two of the constitutional symptoms or signs of SLE (severe fatigue, fever, malaise, or involuntary weight loss).[10] Indeed, although the record reflects that Wright experienced weight loss (*see, e.g.*, Tr. 463-64, 467-68, 553-54, 557, 620), he points to only a few occasional complaints of severe fatigue or malaise (Tr. 467, 487, 572), which are insufficient to meet the requisite level of severity. *See, e.g.*, *Griffith v. Barnhart*, No. 00 C 7302, 2002 WL 181959, at *12 (N.D. Ill. Feb. 6, 2002) (finding that two reports of fever or weight loss were insufficient to satisfy subsection A2 of Listing 14.02). Thus, Wright's failure to show he meets the requirements of subsection A2 of Listing 14.02 provides an additional basis upon which the affirm the ALJ's step-three finding.

In short, Wright fails to carry his burden of establishing that he meets or equals all of the criteria for Listing 14.02. *See Booth*, 2008 WL 744230, at *11 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify." (citing *Zebley*, 493 U.S. at 530)); *see Bellmore*, 2010 WL 1266494, at *14 (same). The ALJ's step-three finding that Wright does not meet or equal a listing is supported by substantial evidence and thus will be affirmed.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The

---

[10] In the context of Listing 14.02, "[s]evere fatigue means a frequent sense of exhaustion that results in significantly reduced physical activity or mental function," and "[m]alaise means frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function." 20 C.F.R. § 404, Subpart P, App. 1, 14.00C.

Clerk is directed to enter a judgment in favor of the Commissioner and against Wright.

SO ORDERED.

Enter for this 29th day of October, 2012.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge
